UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MOHAMED HILALY MAJEED,

                        Plaintiff,

            -against-

ADF COMPANIES,

                        Defendant.
-------------------------------------------------------------------X

**ORDER**
11-CV-5459(SJF)(ETB)

FEUERSTEIN, District Judge:

On November 8, 2011, *pro se* plaintiff Mohamed Hilaly Majeed ("plaintiff") commenced

this action against defendant ADF Companies ("defendant") pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, alleging claims for: (1)

discrimination in the terms and conditions of employment based upon his gender, religion,

national origin and age; and (2) retaliation. Pending before the Court is defendant's motion, *inter*

*alia*, to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure. For the reasons set forth herein, defendant's motion is granted.

I.      Background

        A.      Factual Background[1]

---

[1] The factual allegations are taken from the complaint and plaintiff's opposition papers,
which are construed to be amendments to the complaint, see, e.g. Small v. Ortlieb, No. 10-cv-
1616, 2012 WL 3229298, at * 1 (E.D.N.Y. Aug. 6, 2012) ("[A]s part of th[e] Court's duty to
construe *pro se* pleadings liberally, the Court will take account of all the facts contained in both
[plaintiff's] amended complaint and his opposition papers); Locicero v. O'Connell, 419 F.
Supp.2d 521, 525 (S.D.N.Y. 2006) ("In the case of a motion to dismiss involving a claim by a
*pro se* plaintiff, a court may look beyond the complaint to the plaintiff's opposition papers.");

Plaintiff is a fifty-seven (57) year old man who commenced employment with defendant as a shift manager at a Pizza Hut located in Lynbrook, New York ("the Lynbrook store") on October 10, 2008. (Compl., ¶¶ 7 and 8). Plaintiff was paid an hourly salary of nine dollars and fifteen cents ($9.15) for management work and seven dollars and seventy-five cents ($7.75) for production work. (EEOC Compl., at 1). Shamim Akhtar ("Akhtar"), a male, was the restaurant general manager ("GM") at the Lynbrook store at the time that plaintiff started working there. (Id.)

On or about December 31, 2008, Akhtar hired another shift manager, Mohamed Rahuman ("Rahuman"), also a male, to replace a female shift manager, Jyazia Deverteuil ("Deverteuil"), who was demoted to server. (Compl., ¶¶ 7-8). Plaintiff alleges that he was denied participation in training and certification programs that were offered to Rahuman, whom he alleges is in his thirties[2], (EEOC Compl., at 6), and other "new junior recruits," and that he was paid a salary at a lower hourly rate than Rahuman and "many other co-workers/subordinates." (Compl., ¶ 8). According to plaintiff, Rahuman was paid at hourly rates of nine dollars and fifty cents ($9.50) for management work and eight dollars ($8.00) for production work. (EEOC Compl., at 7). Plaintiff alleges that when he complained to Akhtar about his salary, he was told that he is "not

---

Baldwin v. LIJ North Shore Health System, 392 F. Supp. 2d 479, 481 (E.D.N.Y. 2005) ("In consideration of the plaintiff's *pro se* status and the liberal rules regarding amendments to pleadings, the Court will treat the factual allegations in the [plaintiff's] affidavit [in opposition to the defendant's motion to dismiss] and its attachments as amendments to the complaint."), and do not constitute findings of fact by the Court.

[2] Although plaintiff conclusorily alleges that he was treated differently than Rahuman based upon his national origin and language and that Akhtar and Rahuman "are from the same nationality and speak the same language but [he] belong[s] to a different nationality and do[es] not speak their language," (EEOC Compl., at 15-16), he does not identify either his or Rahuman's national origin.

young enough to get a higher rate." (Id.)

Plaintiff alleges that Iftakhar Ahmed ("Ahmed")[3], a male employed in the Lynbrook store from February to March 2009, (EEOC Compl., at 9), "prevented [him] from attending March 2009 [training] classes to which [he] had already enrolled," (EEOC Compl., at 2, 9), although he does not claim that Ahmed participated in those classes instead. In his EEOC complaint, plaintiff alleges that Akhtar refused him entry into the training programs in which he had enrolled in March, April and June 2009. (EEOC Compl., at 6). According to plaintiff, when he complained to Akhtar "about Certificate Programs, [he] was always simply told that [he] would be sent next though it never happened during [Akhtar's] time [with defendant]," then Akhtar retaliated against him by reducing his hours. (Id.) Plaintiff nonetheless participated in the same program in which Rahuman had participated in August 2009.[4] (Id.)

Plaintiff further alleges that two (2) other male shift managers, Abhinav Datta ("Datta")[5], who is in his twenties, and Raj Kumar ("Kumar")[6], whose age plaintiff does not identify except to state that he "looks like he is in his 30's," were given opportunities to participate in training and certification programs soon after their appointments, whereas it took plaintiff fifteen (15)

---

[3] Although plaintiff identifies Ahmed as a shift manager, the Store Schedule Grids submitted by plaintiff in his opposition indicate that Ahmed worked as a server or in production, not as a manager.

[4] Although plaintiff claims that Ricardo Melendez ("Melendez") was the new GM when he attended the training program, the Store Schedule Grids indicate that Melendez was only an assistant manager in August 2009 and that Ahsan Ali ("Ali") was the GM at the Lynbrook store as of August 4, 2009.

[5] According to the EEOC complaint, Datta commenced working as a shift manager in the Lynbrook store on December 23, 2009. (EEOC Compl., at 9).

[6] According to the EEOC complaint, Kumar worked in the Lynbrook store from April to May 2010. (EEOC Compl., at 9).

months to be allowed to participate in the same programs. (EEOC Compl., at 6, 7, 11).

Plaintiff also alleges that new recruits, including Rahuman, "were given the opportunity to learn weekly closing on Monday nights[,] [but] [he] was deprived of this opportunity even while [he] was on clock on many such nights." (EEOC Compl., at 11, 12). Plaintiff identifies only one (1) such incident: that on Monday, May 10, 2010, when he was working as the closing manager, he offered to assist the female area coach, Victoria Chevalier ("Chevalier"), in "stock count," but she told him that Kumar, who was not on the schedule, was on his way to the Lynbrook store to help her. (Id.) Plaintiff alleges that the "stock count" was really a training session for Kumar to learn stock count and weekly closing routines. (Id.) Plaintiff further alleges that Datta "was given similar training session soon after his recruitment," whereas he has been "deprived of all types of training sessions except the initial training [he] received at [the] Ozone Park [store]." (Id.)

Plaintiff further alleges that when Melendez was transferred to the Lynbrook store as an assistant manager in May 2009, his hours were "drastically reduced;" his salary was reduced to an hourly rate of seven dollars and seventy-five cents ($7.75); and he was "informally demoted" to team member on June 9, 2009 "without [his] knowledge" as a result of his "continuous denial of certificate programs." (EEOC Compl., at 2, 7). According to plaintiff, at the same time that his salary was reduced, Rahuman's was increased to an hourly rate of ten dollars ($10.00). (EEOC Compl., at 7). Plaintiff further alleges that in February 2010, new recruits who were hired by Chevalier, including Kumar, were paid an hourly rate of eight dollars ($8.00), and that Datta, who was recruited in December 2009, was initially paid an hourly rate of seven dollars and fifty cents ($7.50). (EEOC Compl., at 8). In addition, plaintiff identifies four (4) "team

4

members" subordinate to him who were paid higher salaries than him: Jewelasia R. Council, a female; Juan Escalante, a male; Deverteuil, a female; and Pablo Garcia, a male.[7] (Id.)

Plaintiff alleges that on September 14, 2009, he complained to the new GM, Ahsan Ali ("Ali")[8], a male of the same religion as plaintiff, (EEOC Compl., at 17), about a disobedient female server, Rezwana Alam ("Alam")[9], whom he claims was favored by Ali.[10] (EEOC Compl., at 2, 13, 18). On that same date, following release of the work schedule assigning plaintiff to work as a shift manager on September 20, 2009, "the most important holiday in [his] religious calendar," plaintiff approached Ali and "politely reminded [him] about [his] festival leave request." (EEOC Compl., at 17). According to plaintiff, Ali told him that the work schedule could not be changed; refused to schedule Madhav Gupta ("Gupta"), a new part-time shift manager, as an alternative[11]; and denied his request for leave, although he allowed a regular part-time cook to take leave "for the same purpose." (Id.) According to plaintiff, Ali's rejection of

---

[7] According to plaintiff, Council is "a Caribbean girl hired by [Chevalier] in February 2010" as a part-time trainee, who was paid an hourly rate of eight dollars ($8.00), (EEOC Compl., at 19); and in February 2010, Deverteuil was paid an hourly rate of nine dollars and thirty-five cents ($9.35), which he claims was above the maximum rate of pay for production work, (id.).

[8] The Store Schedule Grids included in plaintiff's opposition indicate that Ali and Melendez both worked as assistant managers during the week of July 28, 2009 and that Ali worked as the GM and Melendez worked as an assistant manger the following week, i.e., the week of August 4, 2009.

[9] Plaintiff claims that he was classified as a shift manager but paid at a production rate, whereas Alam was classified as a server but "often" paid at production rate; that his hours were reduced while Alam's were increased; and that his schedule rotated but Alam worked a permanent schedule. (EEOC Compl., at 18).

[10] Plaintiff does not indicate the basis for Ali's alleged favoritism of Alam.

[11] Gupta was not transferred to the Lynbrook store until September 16, 2009, two (2) days after plaintiff received the work schedule.

his leave request was in retaliation for his complaints about Alam. (EEOC Compl., at 18).

Plaintiff alleges that on September 16, 2009, Gupta was transferred to the Lynbrook store from another store to "punish [him] indirectly" for complaining to Ali about Alam.[12] (EEOC Compl., at 2). According to plaintiff, Gupta "took off [plaintiff's] hours indirectly." (Id.) Plaintiff alleges that "[w]henever new faces [were] introduced to management positions, * * *, mostly [his] hours were trimmed to accommodate the new comers," yet Rahuman, Datta and Kumar "were given almost full hours." (EEOC Compl., at 9, 10). However, plaintiff identifies only one (1) incident: that he was allocated only five and a half (5.5) hours for the week beginning May 4, 2010, upon his return from an extended vacation leave. (EEOC Compl., at 10). According to plaintiff, when he complained to Ali about the loss of hours, he was told that he "cannot be compared with the[] young guys and [he] may find another job."[13] (EEOC Compl., at 9).

Plaintiff also alleges, however, that when Ali first started at the Lynbrook store, he gradually increased plaintiff's hours and reduced Rahuman's hours, and "created a pleasant work environment," and that changed only after plaintiff complained to Ali about Alam. (EEOC Compl., at 12, 13, 16). Plaintiff alleges that Ali also harassed him in other ways, and created a hostile work environment, after he complained about Alam, including compelling him to do "delivery fixing" within his regular hours and "burdening [him] with heavy work load." (EEOC Compl., at 13-14). In addition, plaintiff alleges that Ali compelled him to go on break to

---

[12] According to the EEOC complaint, Gupta worked at the Lynbrook store from September to October 2009. (EEOC Compl., at 9).

[13] However, plaintiff alleges that it was Chevalier, not Ali, who made the work schedule for the week beginning May 4, 2010. (EEOC Compl., at 3, 4, 10).

discharge his religious duties, in violation of the Hourly Team Member Handbook which allowed such time to be made up or charged against accrued leave.[14] (EEOC Compl., at 16).

According to plaintiff, his "scheduled hours were pruned to the convenience of the incoming manager, and occasionally it was even extended * * *. [His] hours were ruled by the incoming manager and not by the work schedule," (EEOC Compl., at 9, 13); his complaints about the work schedule were ignored, (id.); Ali refused his request to be placed on a permanent work schedule, (id.); he "was compelled to accept the rotating work schedule, while Rahuman was mostly allowed to choose his days according to his diary," (EEOC Compl., at 13); and "[a]lmost all the Team Members [were] allowed to choose their work schedule accept [him]self," (id.).

In addition, plaintiff alleges that he was subjected to "work related harassment" by Ali, such as "receiv[ing] [a] clock-in message from [Ali] to clean the restrooms" when he worked as opening manager, although it is the duty of the closing manager to "make[] sure that the dishwasher cleans the rest rooms * * *,"[15] (EEOC Compl., at 2); and being "summon[ed] to

---

[14] The religious accommodation policy to which plaintiff refers is applicable to "[c]ompany employees working in New Jersey," and, therefore, is inapplicable to plaintiff.

[15] The "clock-in message" attached to plaintiff's opposition papers indicates that it was sent to plaintiff by Ali on October 7, 2009 at 10:13 p.m. and requests that upon opening the store on October 8, 2009, plaintiff clean the parking lot, restrooms and outside mirrors, and sweep and mop the front dining area, because Chevalier was going to be visiting the store on that date. The Store Schedule Grid for the week of October 6, 2009 indicates that Ali was the closing manager on October 7, 2009, plaintiff was the opening manager on October 8, 2009 and Rahuman was the closing manager on October 8, 2009. Instead of cleaning everything himself at 10:30 p.m., when Chevalier was not due to visit the Lynbrook store until the following day, Ali, as the GM, chose to delegate those duties to the opening manager, which happened to be plaintiff.

work during [his] vacation,"[16] (EEOC Compl., at 4). Plaintiff further alleges that Ali "stole[]" his hours on several occasions "after clock-out," (EEOC Compl., at 9); that he "was called in off schedule with a short notice" on many occasions,[17] (EEOC Compl., at 13, 15); and that he was issued two (2) written warnings "which too were discriminatory,"[18] (EEOC Compl., at 2).

Plaintiff alleges that Chevalier delayed the vacation request he made in January 2010 "due to [Ali's] vacation," and did not grant him vacation leave until March 30, 2010. (Id.)

Plaintiff further alleges that when he complained about the discrimination against him to his superiors, he was subjected to retaliation "in the form of accelerated discrimination and harassment * * *." (Compl., ¶ 8). In his EEOC complaint, plaintiff alleges that on February 4, 2010, he complained to Chevalier about the discrimination and harassment against him, i.e., "the issue of [Ali] stealing [his] hours," (EEOC Compl., at 3, 9), but she ignored his complaints due to "[l]ack of diplomacy and inexperience." (EEOC Compl., at 3).

Plaintiff alleges that Chevalier scheduled him to open the Lynbrook store on Friday,

---

[16] From the documents included in plaintiff's opposition, it appears that on April 12, 2010, when plaintiff was on extended vacation leave, he worked a ten and a half (10.5) hour shift, i.e., from 9:30 a.m. to 8:30 p.m.; Rahuman worked a seven and a half (7.5) hour shift, i.e., from 4:30 p.m. until midnight; and Datta and Kumar were off for unspecified reasons. There is no indication in the documents that plaintiff worked any other date during his vacation leave.

[17] Plaintiff cites but two (2) examples, i.e., that on Sunday, December 20, 2009, Ali asked him to open the store the next day, although he was not originally scheduled to do so, "in order to avoid the off schedule delivery and the messy road condition [sic] due to the heavy snow storm that particular weekend," (EEOC Compl., at 14); and that on January 5, 2010, at 11:48 p.m., he was informed by text message that he needed to open the store the following day, which was a Friday and his only regular day off. (EEOC Compl., at 13).

[18] According to plaintiff, he received a written warning for arriving to work late on December 21, 2009, the date he was called in on short notice, although the male cook who arrived even later than him did not, and at the end of the work day, Ali "stole two hours from [him]." (EEOC Compl., at 14-15).

February 26, 2010, although he "managed to find a replacement," (EEOC Compl., at 13, 17); again scheduled him to open the store on Friday, March 5, 2010 and prevented other shift managers from switching with him, despite "[k]nowing that Friday morning is religiously important to him;" and scheduled Datta, "[h]er favorite" employee, to a better shift than both him and Rahuman in March 2010. (EEOC Compl., at 10-11, 13, 17).

In addition, plaintiff alleges that "[w]hen [Chevalier] realized that [he] [is] an intelligent fraud monitor and capable of handle [sic] any challenges, she planned to get rid of [him] * * * result[ing] in [his] complete exit from the weekly schedule." (EEOC Compl., at 3, 9). According to plaintiff, although he was "waiting to start working from April 27, 2010" following his vacation, Chevalier "refused to release [his] post vacation work schedule" until May 4, 2010, and then he "was given only 5.5 hours initially while the new comers [Datta and Kumar] were placed in full scale." (EEOC Compl., at 3, 4, 10). Plaintiff further alleges that "[i]n the very next scheduling, [Chevalier] put [him] to work in production under an unqualified junior manager with whom [he] had an extremely troublesome experience previously," (EEOC Compl., at 4).

Plaintiff alleges that defendant's senior management was aware of the discrimination and retaliation, yet failed to take "appropriate corrective action" and are now "trying to tactfully terminate" his employment. (Compl., ¶ 8). Specifically, in his EEOC complaint, plaintiff alleges that on May 18, 2010, he complained to Mike Ryan ("Ryan"), defendant's director of people services, that Ali and Chevalier were "jointly playing with [his] work schedule" and that Chevalier had failed to take action on his "complaint of discrimination and harassment" by Ali and continued to discriminate against him and harass him "even in [the] absence of [Ali]."

9

(EEOC Compl., at 4).

Following an investigation into plaintiff's claims, Ryan sent plaintiff a letter dated June 25, 2010 advising him, *inter alia*, that he would be paid for the hours that Ali and Chevalier had reduced "that were not legitimate reductions;" that he had verified that plaintiff had been "demoted from Shift Manager to Team Member in the payroll system effective June 9, 2009 with a corresponding reduction in pay from $9.15/hr to $7.75/hr;" and that since plaintiff never stopped clocking in at work as a shift manager, he would "be paid the difference of $1.40/hr for all hours worked from June 10, 2009 to [the date of the letter]."[19] Nonetheless, plaintiff claims that defendant failed to resolve his complaint "appropriately," insofar as he was told that his complaint was dropped once Ali failed to return to work from his leave of absence. (EEOC Compl., at 5, 10).

In a subsequent letter dated July 14, 2010, Ryan indicated that after investigating additional concerns that plaintiff had raised, he concluded, *inter alia*: (1) that although plaintiff indicated that none of the participants in a team meeting on January 9, 2010 advised that they had any problems with him, Chevalier reported that the participants "expressed concern because [he] would leave the front to go in the back and pray [and] [s]ince [he] [was] the only one who had register access, they'd have to wait to cash customers out until [he] came back up front;" (2) that

---

[19] In addition, the June 25, 2010 letter advised plaintiff that there were "perceived issues about [his] ability to properly make a pizza which need[ed] to be resolved" and directed that plaintiff contact Chevalier and schedule "a mutually convenient time" within the following week for plaintiff to demonstrate that he can make a pizza properly before he could return to work and be reinstated as a shift manager. The letter further advised plaintiff that if he was unable to demonstrate to Chevalier that he could make a pizza properly, he would be re-trained and paid at a production rate until he was able to do it correctly, and that if he failed to contact Chevalier, defendant would "consider [him] to be no longer interested in working for [it] and [would] process [his] resignation."

Chevalier reported that she did not initially send plaintiff to take the certification programs and tests to which she had sent other shift managers "because [he] expressed to her that [his] primary focus was on obtaining an Accounting job [whereas the] [o]thers were sent immediately because their restaurant job was their primary focus;" and (3) that since Ali had already left for his leave of absence, from which he never returned to work, when plaintiff complained about him to Chevalier, "there was nothing [Chevalier] or anyone [else] could do to address [plaintiff's] issues [with Ali]." Ryan again advised plaintiff that he needed to demonstrate to Chevalier that he could make pizza by July 23, 2010 or he would be considered to have resigned from his job with defendant. According to plaintiff, Chevalier's remarks that he would leave the front of the store to go in to the back and pray were false because he would only leave to do his prayers when there were no customers and he would make alternate arrangements for the cash register, (EEOC Compl., at 16), and Chevalier did not make similar charges against Rahuman when he "disappear[ed]" to smoke. (EEOC Compl., at 16-17).

B.     Procedural History

On November 8, 2011, plaintiff commenced this action against defendant alleging claims for discrimination in the terms and conditions of his employment based upon his gender, religion, national origin and age, and retaliation, in violation of Title VII and the ADEA.

Defendant now moves pursuant to, *inter alia*, Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint.[20]

---

[20] Although defendant's motion was originally filed as unopposed on May 7, 2012, I subsequently granted plaintiff's belated motion for an extension of time to serve and file opposition to the motion, which he filed on November 26, 2012, more than seven (7) months after the motion had been served upon him. Plaintiff filed his opposition on December 11, 2012,

II.    Discussion

A.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S.Ct. at 1959. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). However, this tenet "is inapplicable to

within the extended time period.

legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." Iqbal, 556 U.S. 662, 129 S.Ct. at 1949. "While legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations." Id. at 1950; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55,

59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are

no more than conclusions, are not entitled to the assumption of truth." (quotations and citations

omitted)). Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts

beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d

110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New

York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual

allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me

accusation." (internal quotations and citation omitted)).


B.     Discrimination Claims

Although plaintiffs raising discrimination claims "are not required 'to plead facts

sufficient to establish a prima facie disparate treatment claim' under Title VII * * *,'" DiPetto v.

U.S. Postal Service, 383 Fed. Appx. 102, 103 (2d Cir. July 12, 2010) (quoting Boykin v.

KeyCorp, 521 F.3d 202, 212 (2d Cir. 2008)), "the claim must be facially plausible and must give

fair notice to the defendants of the basis for the claim." Anderson v. Davis Polk & Wardwell

LLP, 850 F. Supp.2d 392, 402 (S.D.N.Y. 2012) (quoting Barbosa v. Continuum Health Partners

Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010)); see also Higgins v. NYP Holdings, Inc., 836 F.

Supp. 2d 182, 186-87, 190 (S.D.N.Y. 2011); Krasner v. HSH Nordbank AG, 680 F. Supp. 2d

502, 512 (S.D.N.Y. 2010). A discrimination complaint is sufficient if it alleges that the plaintiff has suffered an adverse employment action on account of a protected characteristic, i.e., his race, color, gender, religion, national origin, age or disability; details the events leading to the adverse employment action; provides relevant dates; and includes the race, color, gender, religion, national origin and/or age of at least some of the relevant persons involved with the adverse employment action. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). "The *sine qua non* of a * * * discriminatory action claim under Title VII is that 'the discrimination must be *because of* [a protected characteristic]." Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (quoting Leibovitz v. New York City Transit Authority, 252 F.3d 179, 189 (2d Cir. 2001)). "[D]ismissal is * * * appropriate where the plaintiff 'fail[s] to allege even the basic elements of a discriminatory action claim[.]'" Maldonado v. George Weston Bakeries, 441 Fed. Appx. 808, 809 (2d Cir. Dec. 19, 2011) (summary order) (quoting Patane, 508 F.3d at 112 & n. 3); see also Mabry v. Neighborhood Defender Service, 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011).

Plaintiff's complaint, as deemed amended by his opposition papers, fails, *inter alia*: (1) to set forth his national origin; (2) to allege any facts from which it may plausibly be inferred that the refusal to send plaintiff for training and certification courses, the determination of plaintiff's salary or any other act by defendant was motivated even in part by plaintiff's gender, religion, national origin or age; or (3) to identify the religion, national origin or age of any employee of defendant who allegedly committed a discriminatory act against him.[21] In other words, plaintiff's

---

[21] Although Chevalier is female, Ryan and all of the general managers, including the ones hired by her, are male; no one's national origin or religion is identified by plaintiff, although plaintiff alleges that he and Ali are of the same religion; and plaintiff does not identify the age of anyone who allegedly committed a discriminatory act.

complaint "does not allege that [] he was subject to any specific gender-based [religion-based, national origin-based or age-based] adverse employment action by [defendant] * * *, nor does it set forth any factual circumstances from which a gender-based [religion-based, national origin-based or age-based] motivation for such an action might be inferred." Patane, 508 F.3d at 112; see also Maldonado, 441 Fed. Appx. at 808-09 (affirming dismissal of the plaintiff's Title VII and ADEA discrimination claims where the complaint failed to allege that the challenged conduct was due to race or age).

### 1.    Training

With respect to his claims pertaining to the delay in sending him to training and certification programs and deprivation of training opportunities, plaintiff does not allege any facts from which it may plausibly be inferred that those acts were based upon his gender, religion, national origin or age.

#### a.    Delay in Attending Training Programs

Plaintiff admits that he eventually attended the same programs as Rahuman and Datta beginning in August 2009 and does not allege that there were any programs which he could have attended during his five (5) months of employment prior to March 2009.[22] Moreover, when Datta was allowed to attend training programs shortly upon his recruitment, Ali was the GM, whereas during the period that plaintiff was denied training following his recruitment, Akhtar

---

[22] In addition, plaintiff alleges that it was Ahmed's recruitment in February 2009 which prevented him from attending the program in March 2009 and that it was Akhtar whp refused to allow him to attend the training programs in which he had enrolled in April and June 2009.

was the GM. Thus, Datta and plaintiff are not similarly situated with respect to plaintiff's delay in training claim. Once Ali became the GM at the Lynbrook store in August 2009, plaintiff was almost immediately permitted to attend the same training programs.

Thus, plaintiff's claim is only that Akhtar permitted Rahuman, who was hired after plaintiff, to attend training programs, whereas plaintiff was not permitted to attend those same programs until Ali took over Akhtar's position as GM.[23] That allegation does not move plaintiff's complaint "across the line from conceivable to plausible," Twombly, 550 U.S. at 570, 127 S.Ct. 1955, absent any non-conclusory factual allegations from which it may be reasonably inferred that defendant's actions were motivated by discriminatory animus. Although the fact that Rahuman was offered training and certification programs more quickly than plaintiff could be "'consistent with' defendant's liability," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955), alone it is insufficient to raise a plausible inference of age-based discrimination.

In any event, any delay in sending plaintiff to the training programs did not constitute an adverse employment action. An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment," Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quoting Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)), i.e., a change that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. "To successfully establish denial of training opportunities as an adverse employment action, a plaintiff must demonstrate that the employer offered training to other employees and that he was

---

[23] Although plaintiff also claims that Kumar was sent to training and certification programs almost immediately upon his recruitment, plaintiff does not identify Kumar's national origin, religion or approximate age. In any event, as with Datta, Kumar was not similarly situated to plaintiff for purposes of his delay in training claim.

denied training under circumstances giving rise to an inference of discrimination." Nidzon v. Konica Minolta Business Solutions, USA, Inc., 752 F. Supp. 2d 336, 349 (S.D.N.Y. 2010); see also Durkin v. Verizon New York, Inc., 678 F. Supp. 2d 124, 140 (S.D.N.Y. 2009) ("Any delay in Defendant providing Plaintiff with * * * training does not rise to the level of materially adverse required to constitute an adverse employment action.")

Moreover, a denial of training constitutes an adverse employment action only "where the training bears on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation." Hill v. Rayboy-Brauestein, 467 F. Supp.2d 336, 352 (S.D.N.Y. 2006) (alterations, quotations and citation omitted); see also Miller v. Ithaca, No. 3:10-cv-597, 2012 WL 1977974, at * 5 (N.D.N.Y. June 1, 2012); Cooper v. Niagara Community Action Program, No. 08-CV-468S, 2010 WL 1407238, at * 7 (W.D.N.Y. Mar. 31, 2010); Sekyere v. City of New York, No. 05 Civ. 7192, 2009 WL 773311, at * 4 (S.D.N.Y. Mar. 18, 2009). "When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action." Hill, 467 F. Supp. 2d at 352; see also Miller, 2012 WL 1977974, at * 5; Sekyere, 2009 WL 773311, at * 4.

Plaintiff does not allege that the programs in which his enrollment was delayed were required for his position or a promotion, nor that the delay in attending those programs had any adverse impact upon the terms and conditions of his employment or compensation. Any inference that attending the program and passing the exam were required in order to maintain the position as shift manager is belied by plaintiff's allegations that he passed the exam following the program he attended in August 2009 either at the same time as, or before, Rahuman, who had to

take the exam multiple times before he passed it yet remained as a shift manager prior to passing the exam. Although plaintiff attempts to connect his "informal demotion" in June 2009 to his failure to attend any training programs, there are no factual allegations in the complaint to support such a plausible inference.

In any event, although plaintiff received a lower salary following his "informal demotion" in June 2009, he was eventually compensated at his full shift manager salary following Ryan's investigation of his claims. Since plaintiff has not alleged any material harm resulting from the delay in training, it did not constitute an adverse employment action as a matter of law. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's discrimination claims based upon the delay in providing plaintiff with training and certification programs is granted and those claims are dismissed in their entirety with prejudice.

b.    Deprivation of Training Opportunities

Although plaintiff conclusorily alleges that he was denied the opportunity to learn weekly closing routines on Monday nights that was offered to "new recruits," he sets forth but one (1) such example, i.e., that on May 10, 2010, Chevalier denied his offer to assist in "stock count" and instead called Kumar into work off-schedule to assist her.[24] Since Kumar is the same gender as plaintiff, and plaintiff does not identify Kumar's national origin, religion or age, there is no basis to support a plausible inference that Chevalier's conduct was in any way motivated by discrimination. Moreover, at the time that Chevalier purportedly refused plaintiff's offer of assistance and instead called in Kumar to assist her, plaintiff had been employed for almost

---

[24] Plaintiff's conclusorily assertion that Datta "was given similar training sessions soon after his recruitment," absent any further details, is not credited.

nineteen (19) months, whereas Kumar had been employed for approximately one (1) month, so plaintiff and Kumar were clearly not similarly situated with respect to their need to learn stock count and weekly closing routines. Indeed, plaintiff admits that he received initial training upon commencing his employment with defendant. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's discrimination claims based upon the deprivation of training opportunities is granted and those claims are dismissed in their entirety with prejudice.

2. Salary

With respect to his claims that his salary was lower than other employees at the Lynbrook store, plaintiff does not allege any facts from which it may plausibly be inferred that he was paid a lower salary than other employees based upon his gender, religion, national origin or age.

Plaintiff identifies the following employees who were paid higher salaries than he was: Rahuman, Kumar, Datta, Council, Escalante, Deverteuil and Garcia. Council, Escalante, Deverteuil and Garcia were never employed as shift managers and, thus, are not similarly situated to plaintiff. In any event, none of those employees were paid more that plaintiff's management salary of nine dollars and fifteen cents ($9.15) an hour, which he eventually received following Ryan's investigation of his claims, with the exception of Deverteuil, who, according to plaintiff, was paid nine dollar and thirty-five cents ($9.35) an hour in February 2010 for production work. There are no factual allegations in the complaint, as deemed amended by plaintiff's opposition papers, to support a plausible inference that the reason for the difference in salaries was gender-based, age-based, national origin-based or religion-based discrimination.

Moreover, as noted above, since plaintiff is the same gender as Kumar and Datta, and

does not identify their religion or national origin, or Kumar's age, there is no basis upon which to support a plausible inference that any differential in plaintiff's salary was motivated by discrimination. In any event, Kumar's and Datta's salaries when they started as shift managers were eight dollars ($8.00) an hour and seven dollars and fifty cents ($7.50) an hour, both less than plaintiff's management salary of nine dollars and fifteen cents ($9.15). Although plaintiff was paid at the lower production rate during the time that Kumar was employed by defendant, that "error" was corrected following Ryan's investigation of plaintiff's claims and plaintiff was eventually compensated at his full management salary.

Although the fact that Rahuman was paid a slightly higher salary than plaintiff may be "'consistent with' defendant's liability," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955), that fact alone is insufficient to raise a plausible inference of age-based discrimination under the circumstances of this case, particularly since Datta, who was also younger than plaintiff, was paid a lower management salary than plaintiff. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's discrimination claims based upon any salary differential is granted and those claims are dismissed in their entirety with prejudice.

### 3. Reduction in Hours and Other Harassment

#### a. By Ali

Plaintiff fails to allege any facts to support a plausible inference that the reduction in his work hours or other purported harassment by Ali was motivated in any way upon discrimination. All of the similarly situated shift managers identified by plaintiff, i.e., Rahuman, Datta and

20

Kumar, are the same gender as plaintiff, and plaintiff does not identify their religion or national origin, other than to indicate that Ali was the same religion as himself, thereby belying any claim of religious discrimination[25]. Moreover, although plaintiff repeatedly complains that his hours were reduced, he also complains that his hours were extended on occasion. Furthermore, plaintiff admits that upon commencing employment as the GM at the Lynbrook store, Ali initially increased plaintiff's work hours and reduced Rahuman's hours, thus belying any claim of age-based discrimination. According to plaintiff, it was only after he complained to Ali about Alam[26] that Ali reduced his hours, and engaged in other purported harassment of him, e.g., denying his request for religious leave, transferring Gupta to the Lynbrook store, failing to give him a permanent work schedule. Moreover, plaintiff was compensated for any "illegitimate" reduction in his work hours following Ryan's investigation of his claims. Thus, the branch of defendant's motion seeking dismissal of plaintiff's discrimination claims based upon Ali's reduction of his hours and harassment is granted and those claims are dismissed in their entirety with prejudice.

b.    By Chevalier

Plaintiff also fails to allege any facts to support a plausible inference that the reduction in his work hours and delay in approving his vacation leave by Chevalier were motivated in any way by discrimination. Indeed, plaintiff alleges that Chevalier delayed his vacation leave request

---

[25] In addition, plaintiff alleges that Ali allowed another male employee of their same religion to take leave for the purpose of attending the religious festival for which plaintiff sought leave to attend, further belying plaintiff's claims of religious discrimination.

[26] Plaintiff provides no basis for Ali's purported differential treatment of Alam, nor does he allege that Ali treated all female employees more favorably than male employees.

21

and decreased his hours because she wanted to get rid of him after she realized that he is "an intelligent fraud monitor" and ignored his complaints about Ali "due to her lack of diplomacy and inexperience," not for any discriminatory purpose. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's discrimination claims based upon the reduction of hours and denial of vacation leave request by Chevalier is granted and those claims are dismissed with prejudice.

      C.      Hostile Work Environment Claim

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive * * *; (2) creates an environment that the plaintiff subjectively perceives as hostile or abuse; and (3) creates such an environment because of the plaintiff's sex [or other protected characteristic]." Patane, 508 F.3d at 113. The complaint contains only a conclusory allegation that plaintiff "was subjected to a hostile work environment base [sic] on [his] Age, National Origin, Religion and Sex" and, even as deemed amended by plaintiff's opposition papers, *inter alia*, fails to set forth any facts from which it may plausibly be inferred that the mistreatment at work of which he complains occurred because of his gender, religion, national origin or age or was objectively severe or pervasive. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's hostile work environment claim is granted and plaintiff's hostile work environment claim is dismissed in its entirety with prejudice.

D.    Retaliation Claims

The Swierkiewicz pleading standard, i.e., that the claim be facially plausible and give fair notice to the defendants of the basis for the claim, "applies with equal force" to retaliation claims. Williams v. New York City Housing Authority, 458 F.3d 67, 72 (2d Cir. 2006). "While [the plaintiff] need not specifically plead every element of a *prima facie* case to survive a motion to dismiss * * *, [he] must nevertheless plead facts sufficient to render [his] retaliation claims plausible." Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 187 (E.D.N.Y. 2012) (quotations and citation omitted); see also James v. Countrywide Financial Corp., 849 F. Supp. 2d 296, 311 (E.D.N.Y. 2012) ("Though not required to plead the elements of a prima facie case, the complaint must still nudge plaintiff's claims across the line from conceivable to plausible to survive a motion to dismiss." (quotations, alterations and citation omitted)).  A complaint that makes only a general conclusory statement that the defendant retaliated against the plaintiff, and that fails to provide any factual detail describing the specific acts of retaliation, when it occurred and which employee of the defendant had knowledge of the plaintiff's protected activity or actually engaged in the claimed retaliation, is insufficient to withstand a motion to dismiss.  See Saidin v. New York City Department of Education, 498 F. Supp. 2d 683, 688 (S.D.N.Y. 2007).

Plaintiff alleges, *inter alia*, that "[w]henever[] [he] discussed the discriminatory measures that were directed at [him], with [his] superiors at different level [sic] it backfired on [him] and continued to be retaliated in the form of accelerated discrimination and harassment * * *;" that he has been "retaliated constantly against complaining about discrimination and harassment;" and that defendant's "senior management" "is well aware of the situation * * * [yet] nullified [his] complaint, retaliated further and now, are trying to tactfully terminate [him]."  (Compl., ¶ 8).

23

Those conclusory allegations are insufficient to state a plausible claim of retaliation absent, *inter alia*, any factual detail about the alleged retaliatory acts, when they occurred and who actually engaged in the alleged retaliation.

Moreover, there is no basis in the factual allegations in the complaint, as deemed amended by plaintiff's opposition papers, from which it may plausibly be inferred that plaintiff participated in a protected activity, a necessary element to state a retaliation claim under Title VII and the ADEA. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Id. Although plaintiff alleges that he complained to Akhtar about the failure to send him for training and certification programs, he does not allege that he ever complained to Akhtar, or any other employee of defendant, that the refusal to train him was motivated in any way by discrimination. Similarly, there is no basis from which to plausibly infer that plaintiff's complaints to Ali about Alam in any way involved protests of statutorily prohibited discrimination. See, e.g. Benn v. City of New York, 482 Fed. Appx. 637, 638-39 (2d Cir. May 23, 2012) (finding that the plaintiff's complaints to his supervisors concerning disputes about, *inter alia*, his responsibilities, the condescending manner in which one supervisor spoke to him, and a late-night telephone call from a supervisor that disturbed his sleep "could not reasonably have been understood to protest statutorily prohibited discrimination and, thus, [did] not qualify as protected activity that may give rise to a claim of retaliation."); Drumm v. SUNY Geneseo College, 486 Fed. Appx. 912, 914 (2d Cir. June 29, 2012) (holding that complaints "amount[ing] only to general allegations of mistreatment * * * do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination" and, thus, do not

constitute protected activity).

In addition, Chevalier's delayed approval of plaintiff's vacation request in January 2010 was not retaliatory since, *inter alia*, plaintiff does not allege that he ever made any complaints to Chevalier prior to his February 4, 2010 complaint. Accordingly, there is no causal connection between plaintiff's complaints to Chevalier, even if considered protected activity, and the delayed approval of his vacation request.

Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's retaliation claims is granted and plaintiff's retaliation claims are dismissed in their entirety with prejudice.


III. Conclusion

For the foregoing reasons, defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and the complaint is dismissed in its entirety with prejudice. The Clerk of the Court shall enter judgment in favor of defendant and close this case.

SO ORDERED.

s/ Sandra J. Feuerstein

_____
Sandra J. Feuerstein
United States District Judge

Dated:      February 20, 2013
            Central Islip, New York

25